Trinette G. Kent (AZ Bar No. 025180)
KENT LAW OFFICES
3219 E. Camelback Rd #588
Phoenix, AZ 85018-2346
Telephone: (480) 247-9644
Email: tkent@kentlawpc.com

Daniel M. Hattis*
Paul Karl Lukacs*
HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

Stephen P. DeNittis, Esq.*
Shane T. Prince, Esq.*
DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410
525 Route 73 N.
Marlton, New Jersey 08057
Telephone: (856) 797-9951
Email: sdenittis@denittislaw.com
Email: sprince@denittislaw.com

* Pro Hac Vice Application To Be Submitted

*Attorneys for Plaintiffs and the Proposed Class and Subclasses*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raven Lewis; Bill Thacker; TP Lynn Jackson; Carrie Rizzo; Andrew Salazar; Antoinette Salazar; Vicky Simmons; Jack Ullstrup; Vern Urich; Linda Verner; and Rosemarie Vlacich, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>            v.<br><br>Cox Communications, Inc.; CoxCom, LLC; and Cox Communications Arizona, LLC,<br><br>        Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Raven Lewis, Bill Thacker, TP Lynn Jackson, Carrie Rizzo, Andrew Salazar, Antoinette Salazar, Vicky Simmons, Jack Ullstrup, Vern Urich, Linda Verner, and Rosemarie Vlacich, individually and on behalf of all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendants Cox Communications, Inc.; CoxCom, LLC; and Cox Communications Arizona, LLC (hereinafter collectively, "Cox" or "Defendants"):

## I.     <u>INTRODUCTION</u>

1.     This action challenges a deceptive pricing and billing scheme whereby Cox falsely advertised and promised to new and existing customers that the monthly prices for Cox's service plans[1] would be at quoted, fixed rates for a 1- or 2-year Minimum Term Agreement[2] or Promotional Agreement[3], but then, after the customer signed up, Cox as a matter of policy would unlawfully increase the service price in the middle of the promised fixed-rate period. Notably, Cox's deceptive price advertising and practices were uniform in all of Cox's sales channels. According to Cox, consumers would "Get the exact same price when you shop online, by phone or in-store."

2.     **<u>Price Increase Method No. 1: Cox Increased the Broadcast Surcharge and Regional Sports Surcharge Mid-Agreement.</u>** For customers who signed up for

---

[1] "Service plan" as used in this Complaint refers to a Cox cable service plan with television and/or internet service, including service plans that "bundled" television and/or internet service with phone or home security services.

[2] "Minimum Term Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, and the subscriber is subject to an <u>early termination fee penalty</u> if he or she terminates service prior to the end of the promotional period. "Minimum Term Agreement" is not used in this Complaint to refer to a specific written contract document. Cox offered Minimum Term Agreements both to new customers and to existing customers who were renewing or changing their service plans.

[3] "Promotional Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, with <u>no early termination fee penalty</u>. Cox offered Promotional Agreements both to new customers and to existing customers who were renewing or changing their service plans.

Minimum Term Agreements or Promotional Agreements between 2014 and March 22, 2021, Cox increased the promised fixed monthly service rate in the middle of the agreement by annually increasing two disguised monthly television service charges, which Cox called the "Broadcast Surcharge" and the "Regional Sports Surcharge" (the "Surcharges"). (Prior to March 23, 2021, Minimum Term Agreements were the most common type of subscription service plan offering by Cox, and Promotional Agreements were less common.)

3.       Cox advertised and quoted fixed rates for each Minimum Term Agreement or Promotional Agreement it offered, including a detailed graphical monthly price chart that broke out the price to be charged each and every month for the service plan under the agreement. On its website, Cox explicitly stated that for Minimum Term Agreements, the quoted fixed prices were "guaranteed" and only excluded equipment, movie rentals, and non-service charges. Notably, those advertised fixed rates, including the prices promised in the month-by-month price charts, excluded the amount of the Surcharges (and also their increases)—even though the Surcharges were, in fact, monthly "service charges."

4.       Then, contrary to these promises and representations, a few months after the customer signed up Cox as a matter of policy would covertly increase the monthly service price mid-agreement by raising the Surcharges.

5.       If a customer noticed the price increase to his or her service plan (after the Surcharges had been increased mid-agreement) and called Cox to complain, Cox agents would deceptively tell the customer that only the Surcharges had increased but that the service price remained the same (despite the fact that the Surcharges were charges for service). The agents would also falsely say that the Surcharges were pass-through government fees and/or were outside of Cox's control.

6.       Notably, Cox recently entered into a **$13 million settlement with the Arizona Attorney General** in connection with the unilateral increase of these Surcharges during fixed-rate Minimum Term Agreements between January 2015 and March 2021. The Arizona Attorney General's office described the case against Cox as

3

follows when announcing the settlement on January 4, 2024 (emphasis added):[4]

> Attorney General Mayes' lawsuit [filed December 15, 2023] alleged that Cox deceived Arizonans who purchased television services to enter long-term contracts through promises of a "price lock guarantee" and other fixed-pricing "deals." . . . Between January 2014 and March 2021, Cox reserved the ability to regularly raise the bills of price-locked customers through increases in company-imposed fees [of the Broadcast Surcharge and the Regional Sports Surcharge]. . . . **By disguising price increases as fees, Cox routinely raised the bills of customers who thought they had secured a locked-in price**.

7. Three million dollars of the settlement proceeds will go to Cox Arizona customers who paid the Surcharges, with each projected to receive a partial refund of approximately $12.

8. Starting March 23, 2021 (the same month that the Arizona Attorney General served its Civil Investigative Demands on Cox concerning Cox's mid-agreement Surcharge increases), Cox modified its <u>new</u> cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge. In their place, Cox increased the prices of the new service plans by an amount equivalent to the Surcharges—which further confirmed that the Surcharges had actually been extra charges for Cox's <u>services</u> all along.

9. **<u>Price Increase Method No. 2: Cox Increased the Base Price of the Service Plan Mid-Agreement.</u>** After Cox eliminated the Surcharges from new service plans on March 23, 2021, Cox switched to a new strategy of outright increasing the base price of the service plan in the middle of the Promotional Agreement. (On or around March 23, 2021, Promotional Agreements replaced Minimum Term Agreements as the most common type of subscription service plan offering by Cox.[5])

---

[4] *See* Arizona Attorney General press release dated January 4, 2024, "Attorney General Mayes Announces $13 Million Settlement with Cox Communications for Disguising Price Increases as Routine Fees," available at https://www.azag.gov/press-release/attorney-general-mayes-announces-13-million-settlement-cox-communications-disguising (last accessed September 3, 2024).

[5] Regarding customers who signed up for <u>Minimum Term Agreements</u> on or after March 23, 2021 (after Cox eliminated the Surcharges from its new plans), those customers were

10.     Cox advertised and promised fixed rates for each Promotional Agreement service plan, and Cox continued to advertise a detailed graphical monthly price chart that broke out the price to be charged each and every month for the service plan under the Promotional Agreement.

11.     But then after the customer signed up, Cox—in violation of its representations and agreement with the customer—would raise the monthly service price above the promised fixed rate in the first quarter of each year when Cox implemented its annual company-wide price increases across nearly all of its service plans.

12.     While Cox advertised and promised on sign-up that customers would receive a fixed dollar-amount <u>price</u> for the 1- or 2-year Promotional Agreement, that was not how Cox actually implemented the promotion in its back-end billing system. The investigation by Plaintiffs' counsel revealed that Cox instead wrongly implemented the Promotional Agreement pricing in the customer's account as a fixed dollar-amount <u>discount</u> off Cox's ever-changing and higher so-called "retail rate."

13.     Meanwhile, Cox had a policy and practice of implementing across-the-board increases of the "retail rate" for nearly every one of its service plans in the first quarter of each year. And whenever Cox increased the "retail rate," the customer's monthly service price suddenly <u>increased in tandem</u> by the same dollar amount—even in the middle of a promised fixed-price Promotional Agreement.

14.     If customers noticed the price increase in the middle of their Promotional Agreement and called Cox to complain, Cox agents justified the increase by arguing that Cox was honoring the promotion because the subscriber's discount dollar amount had remained the same.[6] But this defied Cox's uniform pre-sale statements, advertisements,

no longer subject to Cox's mid-agreement price increase scheme. In contrast, customers who signed up for <u>Promotional Agreements</u> after that date (who were the large majority of customers) continued to be subject to Cox's price increase scheme via Cox's mid-agreement increases to the base price of the service plan itself.

[6] In reality, what Cox had <u>actually</u> advertised and promised to the customer was a fixed specific dollar amount <u>price</u>. At the time of purchase, any advertisements or statements of discounts by Cox were represented as applying to the regular price for the service in

1    and promises (including in detailed monthly price charts) of a quoted fixed rate that

2    would not increase during the promotional period.

3         15.    Plaintiffs estimate that Cox has extracted more than $200 million from over

4    1.5 million Arizona subscribers since 2015 via this illegal scheme of increasing its

5    service prices in the middle of promised fixed-rate agreements.

6         16.    Plaintiffs bring this lawsuit on behalf of themselves and classes of similarly

7    situated Arizona consumers, seeking damages and/or restitution, punitive damages, and

8    pre- and post-judgment interest. Plaintiffs also seek a declaration by this court that Cox's

9    practices alleged herein violate Arizona law. Additionally, Plaintiffs, on behalf of

10   themselves and the classes, seek a public injunction to stop these unlawful advertising

11   practices in order to protect the general public.

12   **II.**    **THE PARTIES**

13        17.    Plaintiff Raven Lewis is a citizen and resident of Phoenix, Arizona, where

14   she was a victim of Cox's deceptive pricing and billing scheme described herein.

15        18.    Plaintiff Bill Thacker was a citizen and resident of Tucson, Arizona, where

16   he was a victim of Cox's deceptive pricing and billing scheme described herein. Mr.

17   Thacker is currently a resident of Mountain View, Missouri.

18        19.    Plaintiff TP Lynn Jackson is a citizen and resident of Goodyear, Arizona,

19   where he was a victim of Cox's deceptive pricing and billing scheme described herein.

20        20.    Plaintiff Carrie Rizzo is a citizen and resident of Queen Creek, Arizona,

21   and was a victim of Cox's deceptive pricing and billing scheme described herein while a

22   resident of Arizona.

23        21.    Plaintiffs Andrew Salazar and Antoinette Salazar are citizens and residents

24   of Peoria, Arizona, and were victims of Cox's deceptive pricing and billing scheme

25   described herein while residents of Arizona.

26   _____

27   effect at the time of sign-up, resulting in the quoted and promised fixed price. Cox never
     told or disclosed to the customer that it would instead apply some discount dollar amount

28   to an ever-changing "retail rate" which Cox would increase at its whim (thereby making
     any represented "discount" amount illusory).

22.    Plaintiff Vicky Simmons is a citizen and resident of Surprise, Arizona, where she was a victim of Cox's deceptive pricing and billing scheme described herein.

23.    Plaintiff Jack Ullstrup is a citizen and resident of Phoenix, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a resident of Arizona.

24.    Plaintiff Vern Urich is a citizen and resident Sun City West, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a resident of Arizona.

25.    Plaintiff Linda Verner is a citizen and resident of Phoenix, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a resident of Arizona.

26.    Plaintiff Rosemarie Vlacich is a citizen and resident of Chandler, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a resident of Arizona.

27.    Defendant Cox Communications, Inc. is a privately-owned subsidiary of Cox Enterprises, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and nerve center in Atlanta, Georgia. The footer of Cox's public website targeted to current and prospective residential cable customers states: "©1998 – 2024 Cox Communications, Inc."[7] Cox customer bills instruct customers that checks should be made payable to "Cox Communications."

28.    Defendant CoxCom, LLC is a subsidiary of Cox Communications, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and nerve center in Atlanta, Georgia.

29.    Defendant Cox Communications Arizona, LLC, is a subsidiary of Cox Communications, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and nerve center in Atlanta, Georgia.

30.    Defendants Cox Communications, Inc.; CoxCom, LLC; and Cox

---

[7] *See* https://www.cox.com/residential/home.html, last accessed September 3, 2024.

7

Communications Arizona, LLC, jointly created, implemented, participated in the collection of revenues from, and shared in the proceeds from, the unlawful uniform polices complained of in this Complaint, namely, the deceptive pricing and billing scheme whereby Cox promised and advertised to customers that the monthly prices for Cox's service plans would be at quoted, fixed rates for a 1- or 2-year Minimum Term Agreement or Promotional Agreement period, but then after the customer signed up Cox would increase the service price in the middle of the promised fixed-rate period. All Defendants are collectively referred to herein as "Cox" or "Defendants."

## III.    JURISDICTION AND VENUE

31.    **Subject Matter Jurisdiction.**  The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—i.e., Class Action Fairness Act ("CAFA") jurisdiction—because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

32.    **Personal Jurisdiction.**  This Court has personal jurisdiction over Cox because, without limitation: (1) Cox has purposely availed itself of the privileges of conducting business activities in Arizona; (2) Cox currently maintains systematic and continuous business contacts with Arizona including marketing, selling, and issuing service plans to Plaintiffs and other Arizona consumers; (3) Cox has entered into agreements with Plaintiffs and other Arizona consumers to provide cable TV and internet services; and (4) Cox maintains offices and retail locations throughout Arizona. Cox has sufficient minimum contacts with Arizona to render the exercise of jurisdiction by this Court permissible.

33.    **Venue.**  Venue is proper pursuant to 28 U.S.C. §1391 because all Plaintiffs reside and/or suffered damages in this District; many of the acts and transactions giving rise to this action occurred in this District; Cox is authorized to conduct business in this District; Cox does substantial business in this District; Cox has intentionally availed itself of the laws and markets within this District through distribution, marketing and sale of its

1    services in this District; and Cox is subject to personal jurisdiction in this District.

2    **IV.    FACTUAL ALLEGATIONS OF COX'S DECEPTIVE PRICING AND**

3    **BILLING SCHEME**

4        34.    Defendant Cox currently provides cable TV and/or internet services to

5    approximately 6.5 million households nationwide, including approximately 1.4 million

6    households in Arizona.

7        35.    At all relevant times, Cox has advertised its service plans through pervasive

8    marketing directed at the consuming public in Arizona. This marketing has included

9    advertisements on the Cox website; marketing emails; direct mailers; materials and

10   advertising at its Arizona retail stores; video advertisements via social media including

11   YouTube, Facebook, and Twitter; and television, radio, and other internet

12   advertisements.

13       36.    Cox's price advertising and price representations were uniform in all of

14   Cox's sales channels. According to Cox, consumers would "Get the exact same price

15   when you shop online, by phone or in-store." See **Figure 1** below (red box added).

16   **Figure 1:    Cox Statement on Website that Pricing is the Same in All Sales Channels**

17       (Screenshot from February 28, 2022)

18

19

20



21       37.    For years, Cox falsely advertised, both to consumers who were signing up

22   for the first time, and to existing customers who were renewing or changing their service

23   plans, that the monthly rates for its service plans would be fixed and would not increase

24   above the quoted prices during a 1- or 2-year Minimum Term Agreement or Promotional

25   Agreement. For each service plan agreement Cox offered, Cox also advertised a detailed

26   graphical monthly price chart that broke out the quoted price to be charged each and

27   every month under the agreement.

28       38.    But then after the customer signed up, Cox—in violation of its

1    representations and agreement with the customer—would as a matter of policy

2    unlawfully increase the service rate in the middle of the supposedly fixed-rate period.

3        39.    Below are further details regarding how Cox implemented its unlawful

4    price increases in the middle of promised and agreed-to fixed-rate periods.

5    **A.    Price Increase Method No. 1: Cox Increased Prices Mid-Agreement By**

6    **Raising the Broadcast Surcharge and the Regional Sports Surcharge.**

7        40.    For customers who signed up for their service plans between 2014 and

8    March 22, 2021, Cox increased the promised fixed monthly price of its service plans by

9    annually increasing two disguised television monthly service charges, which Cox called

10   the "Broadcast Surcharge" and the "Regional Sports Surcharge" (the "Surcharges").

11   These mid-agreement increases were contrary to the fixed prices previously quoted and

12   promised by Cox agents and were contrary to the advertisements on the Cox website at

13   sign-up.

14       41.    In addition to making these affirmative misrepresentations about Cox's

15   service prices, Cox failed to adequately disclose the existence of the Surcharges during

16   the signup process. And Cox never disclosed the fact that Cox could and would use the

17   Surcharges as a covert way to increase the price of its service plans mid-agreement,

18   directly contrary to Cox's representations and promises of quoted fixed rates.

19       42.    Notably, Cox recently entered into a **$13 million settlement with the**

20   **Arizona Attorney General** in connection with the unilateral increase of these

21   Surcharges during fixed-rate Minimum Term Agreements between January 2015 and

22   March 2021.[8]

23

24

25

26

---

27   [8] The Arizona Attorney General had served its Civil Investigative Demands on Cox on March 5, 2021. Later that same month, Cox modified its new cable TV service plan

28   offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge.

43.     The Arizona Attorney General's office described the case against Cox as follows when announcing the settlement on January 4, 2024 (emphasis added):[9]

> Attorney General Mayes' lawsuit [filed December 15, 2023] alleged that Cox deceived Arizonans who purchased television services to enter long-term contracts through promises of a "price lock guarantee" and other fixed-pricing "deals." . . . Between January 2014 and March 2021, Cox reserved the ability to regularly raise the bills of price-locked customers through increases in company-imposed fees [of the Broadcast Surcharge and the Regional Sports Surcharge]. . . . **By disguising price increases as fees, Cox routinely raised the bills of customers who thought they had secured a locked-in price.**

44.     Three million dollars of the settlement proceeds will go to Cox Arizona customers who paid the Surcharges, with each projected to receive a partial refund of approximately $12.

**1.     The Broadcast Surcharge and the Regional Sports Surcharge.**

45.     The Broadcast Surcharge is a monthly television service charge that Cox began adding to its customers' bills in January 2015 at a rate of $4.00 per month. Between January 2017 and November 2022, Cox increased the per month Broadcast Surcharge in January of each year as well as in November 2022, for a total of 7 increases. Currently, the Broadcast Surcharge is $22.00 per month.

46.     Cox buried the Broadcast Surcharge in its monthly bill at the end of the "Monthly Services" section under "Additional TV" (thereby also admitting the Broadcast Surcharge was in fact a monthly service charge). Cox provided no definition or explanation of the Broadcast Surcharge in its monthly bills. In fact, Cox used the Broadcast Surcharge as a way to covertly increase the monthly service price for its plans during a customer's promised fixed-rate Minimum Term Agreement or Promotional Agreement.

---

[9] *See* Arizona Attorney General press release dated January 4, 2024, "Attorney General Mayes Announces $13 Million Settlement with Cox Communications for Disguising Price Increases as Routine Fees," available at https://www.azag.gov/press-release/attorney-general-mayes-announces-13-million-settlement-cox-communications-disguising (last accessed September 3, 2024).

47.     The Regional Sports Surcharge is another, separate, monthly television service charge that Cox began adding to its customers' bills in January 2017 at a rate of $6.00 per month. The Regional Sports Surcharge was charged to Cox subscribers with "Contour TV" (previously called "Essential TV") or higher—which comprised the overwhelming majority of Cox cable TV subscribers. Between January 2019 to November 2022, Cox increased the per month Regional Sports Charge in January of each year and in November 2022, for a total of 5 increases. Currently, the Regional Sports Surcharge is $10.00 per month.

48.     Cox similarly buried the Regional Sports Surcharge in its monthly bill at the end of the "Monthly Services" section under "Additional TV" (thereby also admitting the Regional Sports Surcharge was in fact a monthly service charge). Cox provided no definition or explanation of the Regional Sports Surcharge in its monthly bills. Like the Broadcast Surcharge, Cox used the Regional Sports Surcharge as a way to covertly increase the monthly service price for its plans during a customer's promised fixed-rate Minimum Term Agreement or Promotional Agreement.

49.     Cox increased the Broadcast Surcharge and the Regional Sports Surcharge regardless of whether the customer was in the middle of a "guaranteed" fixed-rate and "price-locked" Minimum Term Agreement or Promotional Agreement.

50.     Starting March 23, 2021 (the same month that the Arizona Attorney General served its Civil Investigative Demands on Cox concerning its mid-agreement Surcharge increases), Cox modified its new cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge. In their place, Cox increased the prices of the new service plans by an amount equivalent to the Surcharges—which further confirmed that the Surcharges had actually been extra charges for Cox's services all along.

### 2.     Cox Advertised and Promised "Guaranteed" Fixed Monthly Rates During Minimum Term Agreements.

51.     During this period from 2014 through March 22, 2021, Cox primarily

12

marketed and pushed consumers into 1- or 2-year Minimum Term Agreements.[10] Cox consistently and prominently advertised and promised fixed quoted rates for each Minimum Term Agreement service plan, including a detailed monthly price chart that broke out the price to be charged each and every month for the service plan under the agreement.

52.    Cox promised that the service plan rates were "guaranteed" not to increase and were "price-locked" during the Minimum Term Agreement, and that the quoted rates excluded only equipment, movie rentals, and non-service charges. However, those advertised fixed rates, including the prices promised in the month-by-month price charts, excluded the amount of the Surcharges (and also their increases)—even though the Surcharges were, in fact, monthly "service charges."

53.    Customers who entered into these Minimum Term Agreements gave up their ability to freely quit their service during the agreement without incurring an early termination fee. Customers locked themselves into these Minimum Term Agreements because Cox had represented to them that Cox was similarly locking itself into charging no more than the quoted fixed price during the agreement period.

54.    **Cox's Online Advertising and Order Process.**  On Cox's website and throughout the online order process, Cox repeatedly—and falsely—represented that signing up for a 1- or 2-year Minimum Term Agreement "guaranteed" that the advertised and promised monthly service price would be locked-in for the duration of the agreement.

55.    For example, on Cox's FAQ webpages (see **Figure 2** below), one of the questions asked: "What if I don't want a service agreement?" Cox's posted answer to the question was: **"<u>Service agreements give you peace of mind that your bill won't change over the course of the agreement</u>**, but you can opt out during checkout for $10

---

[10] Up until March 22, 2021, it was also possible, but less common, for a customer to sign up for a fixed-price Promotional Agreement of one or two years (which, unlike a Minimum Term Agreement, did not have an early termination fee penalty). Cox likewise increased the service price in the middle of these promised fixed-price Promotional Agreements via increases to the Surcharges.

more per month." (Emphasis added.)

**Figure 2:    Cox FAQ on Minimum Term Agreement**
(Screenshot from January 9, 2020)



⌃  **What if I don't want a service agreement?**

Service agreements give you peace of mind that your bill won't change over the course of the agreement, but you can opt out during checkout for $10 more per month.

56.    Throughout the online order process, Cox made explicit representations about the quoted and "guaranteed" fixed price of the service plan under the Minimum Term Agreement. For example, see **Figure 3** below, which is representative of what Cox displayed from at least 2018 through March 22, 2021, to consumers during the online ordering process after they had selected one of Cox's advertised offers.[11] (Red boxes added.)

---

[11] This screenshot was taken from the Cox website on January 9, 2020, during the online order process for the "Cox Bronze Bundle with Homelife" 2-year Minimum Term Agreement service plan.

1    **Figure 3:    Cox Online Order Process Webpage**
2                  (Screenshot from January 9, 2020)



23    57.    As the screenshot above shows, Cox advertised fixed "monthly charges" of

24    **"$99.99/mo For 12 months"**, which was a clear promise that the monthly service

25    charges would stay fixed at $99.99 per month for all 12 months of the Minimum Term

26    Agreement.

15

58.     And if the customer clicked the link to "see <u>Offer Terms</u>" it opened a pop-up box where Cox <u>again promised</u> that the price for the customer's service plan would not increase above the quoted rates during the agreement period. See **Figure 4** below.

**Figure 4:    Term Service Agreement Tab of "See Offer Terms" Pop-Up**
(Screenshot from January 9, 2020)



59.     Indeed, as shown in both Figures 3 and 4, Cox repeatedly advertised and promised: "The Service Agreement lets you **guarantee the regular rates** on Cox TV, Internet and Phone services for 2 years. The rates for your **services will not increase above the Service Agreement rate** when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years." (Emphasis added.) Immediately below that, Cox stated: "**What's covered and not covered.** The Service Agreement is offered on TV, Internet and Phone services plus their features, such as a premium channel or voice mail. The Service Agreement does not apply to charges for equipment (such as a receiver or modem), per use items (like a movie rental) and fees for non-services (like taxes and surcharges) which may change."

60.     Cox promised that its fixed price "guarantee" excluded only equipment, movie rentals, and "fees for <u>non-services</u>." Yet Cox has <u>admitted</u> that the Broadcast Surcharge and the Regional Sports Surcharge are fees for <u>services</u> (see ¶¶ 71–77 below), such that this fine print "non-services" exception cannot apply to mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge.

61.     If the consumer clicked on the "Pricing Details" tab of the "See Offer Terms" pop-up for the service plan (i.e., in the same pop-up shown in Figure 3 above), then Cox would display a graphical monthly price chart which listed the dollar amount Cox would charge each and every month for service. See **Figure 5** below (red box added).

**Figure 5:   Monthly Price Chart (Pricing Details Tab of "See Offer Terms" Pop-Up)**
(Screenshot from January 9, 2020)



62.     As the chart shows, Cox explicitly promised that each and every month, for Months 1-24, Cox would charge $99.99 for the service plan (if the consumer scrolled

down by dragging the scrollbar on the right, the "Monthly Charges" listed for Months 9-24 were the same).

63.    All of these pricing representations described above and documented in Figures 2–5 above are typical and representative of Cox's uniform price representations and advertising from 2014 through March 22, 2021 to its customers nationwide, including in the state of Arizona.

64.    **Signing up with Cox sales or customer service agents.**  Likewise, when new or existing customers, including Plaintiffs, signed up for Cox service over the phone, via web-chat, or in-store, Cox sales and customer service agents quoted the exact same prices for the exact same service plans, and made the exact same promises about fixed-rate prices under a Minimum Term Agreement. As Cox stated on its website, "Get the exact same price when you shop online, by phone or in-store." (See Figure 1 above.)

65.    Cox sales and customer service agents pushed Minimum Term Agreements by making the same promises to consumers as on the website that the advertised service rates were "guaranteed" and "price-locked" for those 1 or 2 years. Meanwhile, Cox agents as a matter of policy did not disclose or mention that Cox could, and would, increase the monthly service price mid-agreement by increasing the Broadcast Surcharge and/or the Regional Sports Surcharge. And, even though it was possible to request to sign up for month-to-month service rather than a 1- or 2-year Minimum Term Agreement, Cox agents were trained to not mention the month-to-month option unless a customer specifically asked for it.

66.    These quoted prices and promises of fixed rates for the service plan during the Minimum Term Agreement were false, because in fact Cox would covertly increase the service price mid-agreement by raising the amount of Surcharges.

### 3.    Cox Increased the Monthly Service Rate Mid-Agreement by Raising the Broadcast Surcharge and the Regional Sports Surcharge.

67.    Cox's representations that the monthly service rate was "guaranteed" and "price-locked" and that its Minimum Term Agreements "give you peace of mind that

your bill won't change over the course of the agreement" were false. To the contrary, Cox as a matter of uniform policy routinely increased the monthly price for its services in the middle of its customers' fixed-rate agreements by increasing the two disguised television service fees—the Broadcast Surcharge and the Regional Sports Surcharge.

68.    Cox increased the Broadcast Surcharge seven times since 2015, and increased the Regional Sports Surcharge five times since 2017. And Cox imposed these annual increases on <u>all</u> of its cable TV subscribers, <u>even if they were in the middle of a promised fixed-rate agreement</u>.

69.    Contrary to Cox's fixed-price "guarantee" and promise that the service rate was "price-locked" during the Minimum Term Agreement, Cox utilized the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the agreement.

70.    Meanwhile, customers in Minimum Term Agreements who discovered and were upset about the price increases could not terminate their agreements without having to pay a significant early termination fee penalty.

### 4.    It Is Indisputable That the Broadcast Surcharge and the Regional Sports Surcharge Are Charges for Service.

71.    It cannot be disputed that the Broadcast Surcharge and the Regional Sports Surcharge are extra charges for cable TV <u>service</u>. In fact, Cox has repeatedly admitted that the Surcharges are charges for services.

72.    Notably, Cox listed the Broadcast Surcharge and Regional Sports Surcharge in the "Monthly <u>Services</u>" section of the bill under "Additional TV"—where they were neither defined nor explained. (Meanwhile, Cox did <u>not</u> list the Broadcast Surcharge or the Regional Sports Surcharge under the separate section of the bill labeled "Taxes, Fees and Surcharges.")

73.     Below at **Figure 6** is a copy of the Monthly Services section of a Cox customer bill:

**Figure 6:    Exemplar Bill from February 2021**



74.     Cox has repeatedly confirmed that the Broadcast Surcharge and the Regional Sports Surcharge are just carved-out portions of the customer's cable TV service price. In fact, prior to 2015 those current Surcharge amounts were included in the top-line service plan price.

75.     For example, in one discussion thread on Cox's website, a Cox

representative stated that:[12]

> In the past, all Cox television programming costs and fees were
> simply rolled together in our charges for Advanced TV service or
> the specific Tier of service. Over the years, Cox has had to raise
> service rates due to rising video programming costs and network
> retransmission fees. In an effort to meet the demand for more
> transparent billing practices, we introduced surcharges as a way to
> highlight the different costs associated with the delivery of
> broadcast TV networks. The separate line items simply allow
> customers to better track how these costs impact their total TV
> charge.

76.    These admissions further confirm that the Broadcast Surcharge and the Regional Sports Surcharge are extra television service charges.

77.    And when Cox stopped charging the Surcharges to subscribers of its new cable TV service plans beginning March 23, 2021—and Cox instead increased the top-line price of its advertised TV service plans by an equivalent dollar amount—Cox was further admitting that the Surcharges had really just been disguised extra charges for TV service all along.

**B.    Price Increase Method No. 2: Cox Increased the Base Price of the Service Plan During the Promised Fixed-Price Promotional Period.**

78.    After Cox eliminated the Surcharges from new service plans beginning on March 23, 2021, Cox switched to a new price-increase method of outright raising the base prices of its service plans in the middle of Promotional Agreements.

---

[12] *See* Cox website at: https://forums.cox.com/discussions/archive/to-keep-you-better-informed-a-6-00-surcharge-what/95525, last accessed September 3, 2024 (emphasis added). Meanwhile, the Cox representative's explanation that the Surcharges were implemented by Cox to be "more transparent" in its billing practices and to "highlight" the cost of delivery of the broadcast networks is specious nonsense—in fact, the opposite is true. Cox actually utilized the Surcharges as a way to deceive its customers regarding the true cost of its service plans. Cox enticed customers to sign up by falsely advertising a lower price while utilizing the Surcharges to then covertly charge a higher price. Cox's advertising and quoted prices excluded the amount of the Surcharges altogether, and then Cox never defined or explained in the customer bill what the Broadcast Surcharge or Regional Sports Surcharge were.

1    **1.    Cox Advertised and Promised Promotional Agreements With**
2    **Fixed Monthly Rates.**

3    79.    Around March 2021, Promotional Agreements replaced Minimum Term

4    Agreements as the most common type of subscription service plan offering by Cox.

5    Promotional Agreement service plans had no early termination penalty, but Cox

6    continued to promise (like Cox had for its Minimum Term Agreements) a fixed service

7    price for the agreement period of 1 or 2 years.

8    80.    **Online Advertising and Order Process.**  Cox's website uniformly and

9    consistently advertised Promotional Agreement service plans at quoted fixed prices. For

10   example, below at **Figure 7**, Cox advertised a Promotional Agreement service plan as

11   being **"$139.99/mo for 24 mos. No term agrmt."**:[13]

12   **Figure 7:   Cox Website Advertisement for Promotional Agreement Service Plans**

13   

22   81.    Throughout the online order process for Promotional Agreement service

23   plans (just like Cox had for Minimum Term Agreement service plans as described

24   above), Cox continued to advertise a quoted fixed rate to be charged during the

---

[13] This screenshot was taken from the Cox website on July 13, 2021, and lists advertised Cox service plans with a 2-year fixed price Promotional Agreement. The $139.99/mo service plan on the left was labeled by Cox as the "Internet Preferred 150 + Contour TV Preferred" plan. This screenshot is representative of how Cox has advertised Promotional Agreement service plans on its website since at least March 23, 2021.

Promotional Agreement period.

82. Likewise, Cox continued to advertise and display a graphical monthly price chart in the "See Offer Terms" pop-up for Promotional Agreement plans, just like Cox had for its Minimum Term Agreement plans (as demonstrated in Figure 5 above).

83. For example, below at **Figure 8** is a graphical monthly price chart for a Promotional Agreement service plan that was viewed by a particular consumer on Cox's website on May 11, 2023 (red boxes added). This consumer ultimately purchased on that same day, May 11, 2023, the bundled Internet and TV service plan advertised in Figure 8 as being **"$105.99/mo"** for 24 months. Figure 8 consists of 3 images which together display the "Monthly Charges" as they appeared when scrolling down within the price chart to display all of Months 1–24.[14]

---

[14] This screenshot was taken from the Cox website on May 11, 2023, and shows the monthly price chart for Cox's "Internet Preferred 250 + Contour TV Starter" plan with a 2-year fixed price Promotional Agreement. This monthly price chart is representative of how Cox has advertised and listed its Promotional Agreement service plans on its website since at least March 23, 2021.

**Figure 8:    Monthly Price Chart for Promotional Agreement Plan (May 2023)**

(3 scrolling screenshots display 24 months of quoted monthly charges)



84.     The text above the price chart reads: **"Promotional discounts begin and end, but that shouldn't mean that your amount due each month should be a surprise. Learn how this offer's discounts will affect your monthly rate."** And then in the line-by-line monthly price chart below that, Cox promises to charge the same service price of $105.99 for each and every one of the 24 months under the Promotional Agreement.

85.     The pricing representations and price charts described above and documented in Figures 7 and 8 above are typical and representative of Cox's uniform price representations and advertising of Promotional Agreements since at least 2021 to its customers nationwide, including in the state of Arizona.

86.     <u>**Signing up with Cox sales or customer service agents.**</u>  Meanwhile, new or existing customers, including Plaintiffs, who signed up on the phone, via web chat, or in-store with a Cox agent for a Promotional Agreement service plan were presented with the exact same fixed-rate representations and promises. As described above, Cox even stated on its website that customers would "Get the exact same price when you shop online, by phone or in-store" (see Figure 1 above). And consistent with Cox's website

advertising, Cox agents promised consumers that the monthly service price would be a quoted fixed dollar amount—e.g., "$105.99/mo"—that would not increase during the term of the Promotional Agreement (just like the agents had promised previously regarding Minimum Term Agreements).

> **2.** **Contrary to its Promises, Cox Increased the Service Price in the Middle of Fixed Price Promotional Agreement By Outright Increasing the Base Price of the Service Plan Itself.**

87. Now that Cox could no longer increase its revenues mid-agreement by raising the Surcharges, Cox's new strategy was to outright increase the base price of the service plans themselves. Cox did so even though the price increase defied Cox's explicit pre-sale statements, advertisements, and promises—including in the detailed monthly price charts—that the monthly price would remain at the quoted fixed rate for the duration of the Promotional Agreement.[15]

88. For example, directly contrary to Cox's advertising and graphical monthly price chart for the "$105.99/mo" 24-month Promotional Agreement service plan described above at ¶¶ 83–84 and Figure 8, **in Month 9 Cox outright increased the monthly price to that fixed-rate subscriber by $5.00 (to $110.99)**.

89. Below at **Figure 9** is the Month 8 (December 2023) bill of the very same subscriber who signed up on May 11, 2023 for the "$105.99/mo" service plan shown in the screenshots above at Figure 8. (Red boxes, red lines, and black arrows added.) The Month 8 (December 2023) bill, consistent with the prior bills from Month 1 (May 2023) through Month 7 (November 2023), showed a "Total Monthly Services" price of $105.99, as had been advertised and displayed at sign-up on the price chart (see Figure 8 above).

---

[15] It was still possible for customers to sign up for Minimum Term Agreements after March 22, 2021, but it was much less common.

**Figure 9:** **First 8 Months of Bills of Subscriber Were Consistent With Promised 24-Month Fixed Rate of $105.99/mo for the Promotional Agreement**

**December 2024 Customer Bill**
(Month 8 of 24-Month $105.99 Agreement)

**Price Chart at Sign-Up on 5/11/2023 (See Fig. 8)**
(Promised $105.99/mo fixed total service rate
for all 24 months including Month 8;
Contour TV Starter portion was $56.00/mo)





90.     **Then, in January 2024, Cox implemented its annual company-wide price increases for nearly all of its service plans.** This include increasing the "Contour TV Starter" portion of the bundled service plan that this subscriber (and also hundreds of thousands of other Cox subcribers) had signed up for, from $56.00 to $61.00. Cox implemented this price increase across-the-board to all of its subscribers—even if they were in a promised fixed-rate Promotional Agreement.

91.     Thus, on the subscriber's January 2024 bill (Month 9 of the subscriber's 24-month $105.99/mo fixed-rate agreement), the subscriber's monthly service price was increased by $5.00, to $110.99/mo. This increased price was directly contrary to Cox's explicit pre-sales advertisements and promises (including the monthly price chart), and in breach of Cox's agreement with the subscriber. See **Figure 10** below. (Red boxes, red lines, and black arrows added.)

**Figure 10:  In January 2024 (Month 9), Cox Implemented Its Annual Company-Wide Price Increases and Raised the Subscriber's Promised Fixed Rate by $5.00 (to $110.99/mo)**

**January 2024 Customer Bill**
(Month 9 of 24-Month $105.99 Agreement)

**Price Chart at Sign-Up on 5/11/2023 (See Fig. 8)**
(Promised $105.99/mo fixed total service rate
for all 24 months including Month 9;
Contour TV Starter portion was $56.00/mo)







92.    When the subscriber had signed up 9 months earlier, Cox had promised "Promotional price: $105.99" for all 24 months. Below that Cox had listed the $105.99 price as the "Monthly Charge" on 24 separate rows of its monthly price chart—one for each of the months 1 through 24. (See Figure 10 above at the top of the price chart on the right side.) Cox had assured the subscriber that the monthly prices Cox charged during the agreement would therefore not "be a surprise" (also see Figure 10 at the top of the price chart). But to anyone who took Cox at its word, Cox's $5.00 price increase in the middle of the 24-month fixed-rate agreement was not only "a surprise"—it was also in breach of, and directly contrary to, Cox's promises and explicit representations at sign-up.

93.    During the first quarter of every year, Cox has implemented its annual company-wide price increases for nearly all of its service plans. And as Figures 8–10 above illustrate, Cox has implemented these price increases across-the-board to its subscribers—even if they were in a promised fixed-rate Promotional Agreement.

94.    Cox's unlawful mid-agreement price increase to this subscriber (documented at Figures 8–10 above) is representative and typical of how Cox regularly and unlawfully breached its fixed-price agreements with millions of Promotional Agreement subscribers.

95.    Counsel's investigation found that, contrary to Cox's advertising and the statements of its sales and customer service agents, Cox actually implemented Promotional Agreement pricing in its back-end billing system as a fixed dollar amount discount off of Cox's ever-changing and higher so-called "retail rate" (and not as the fixed dollar amount price that Cox actually advertised and promised).[16] And whenever Cox increased the "retail rate" (typically annually in the first quarter of each year, to

---

[16] In reality, any advertisements or statements of discounts to customers by Cox were represented as applying to the regular price for the service in effect at the time of sign-up, resulting in the quoted and promised fixed price. (E.g., see the Cox price chart examples at Figures 5 and 8 above.) Cox never told or disclosed to the customer that Cox would instead apply some discount dollar amount to an ever-changing "retail rate" which Cox would increase at its whim (thereby making any represented "discount" amount illusory).

whatever amount Cox desired), then the customer's monthly service price suddenly increased in tandem by the same dollar amount—even in the middle of a promised fixed-rate Promotional Agreement.

96.     Consequently, Cox's advertisements and representations were and remain false and contrary to Arizona law. Moreover, by failing to provide its services at the price promised by Cox and agreed to by its customers for the duration of the Promotional Agreement, Cox has breached its agreements with each and every customer in violation of Arizona law.

**C.     Cox Concealed Its Price Increases and Deceived Customers After They Signed Up.**

97.     Cox continued to deceive its customers concerning its mid-agreement price increase scheme after they signed up.

98.     First, Cox concealed its mid-agreement price increases by implementing them several months into the service agreement—and not on the first bill, which a customer would have been more likely to examine after first signing up. Customers would not expect that, contrary to Cox's representations and promises, several months into the agreement Cox would then suddenly increase the supposedly fixed price (either by raising the Surcharges, or by raising the base price of the service plan itself).

99.     With regard to mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge, the increases were relatively small—typically between $1.00 to $3.50 per Surcharge—and were not included in the "Total Your Cox Bundle" price displayed at the top of the customer bill. Cox intended and knew that customers were unlikely to notice the increased amount of the service charges. Meanwhile, Cox did not define or explain the Surcharges anywhere on the bill.

100.     Likewise, with regard to the mid-agreement increases to the base price of the service plan, the increases were relatively small, typically between $2.00 to $5.00. Meanwhile, Cox did not provide any information on the monthly bill that would notify or remind the customer that he or she was in a Promotional Agreement, and Cox did not

state on the bill when the promised fixed price would end—such that customers would be even less likely to notice the mid-promotion price increases.

101.    Further, most Cox customers did not read the full printed monthly bills described above because Cox encouraged its customers to sign up for electronic billing and automatic payment (which Cox calls "EasyPay") instead of receiving paper statements. Through this billing process, customers received a monthly Cox billing email which stated the customer's bill total and informed them that their bill would be automatically paid by the payment due date because they were signed up for EasyPay. Cox's EasyPay program discouraged customers from reviewing their monthly bill. And, because Cox's billing emails only stated the bill total, customers could not tell from the email itself that Cox had increased their monthly service rate (e.g., by increasing the Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the base price of the service plan itself). Because the increases were relatively small compared to a customer's total monthly bill, customers would typically not notice the increase.

102.    Cox also lied to and misled customers who noticed the mid-agreement price increases and called Cox to complain. With regard to mid-agreement Surcharge increases, if any customers discovered that their service plans had increased in price and called Cox to complain, Cox agents would justify the increase by arguing that only the Surcharges had increased while the service price had remained the same (even though the Surcharges were in fact charges for service), and the agents would also falsely say that the Surcharges were pass-through government fees and/or were outside of Cox's control.

103.    With regard to the increase of the service plan base price during a Promotional Agreement, if any customers discovered the price increase and called Cox to complain, Cox agents would justify the increase by arguing that the customer's promotional discount dollar amount had remained the same (i.e., from Cox's ever-increasing "retail rate"; see footnote 16 above). But this defied Cox's explicit pre-sale statements, advertisements, and promises that the quoted monthly price (e.g., "$105.99/mo") would remain at the initially quoted rates and not increase during the

Promotional Agreement.

## V.    PLAINTIFFS' FACTUAL ALLEGATIONS

**Plaintiff Raven Lewis**

104.    Plaintiff Raven Lewis is a citizen and resident of Phoenix, Arizona, where she was a victim of Cox's deceptive pricing and billing scheme described herein.

105.    Ms. Lewis first signed up for Cox services in October 2016 and was a Cox cable TV and internet subscriber for approximately 5 years. Ms. Lewis cancelled her Cox services at the end of December 2021.

106.    Ms. Lewis typically signed up for and renewed her service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Jackson also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told her over the phone. Ms. Lewis also received and viewed direct mail advertising from Cox promoting its fixed price service plan agreements, which was likewise consistent with the promises and pricing that Cox agents told her over the phone.

107.    Ms. Lewis signed up for Minimum Term Agreements and Promotional Agreements with Cox. Each time that Ms. Lewis signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

108.    At least once during the term of each Minimum Term Agreement and Promotional Agreement that Ms. Lewis signed up for prior to March 23, 2021, Cox increased the price of her cable TV service by raising the amount of the Surcharges.

109.    Cox also harmed Ms. Lewis by increasing the base price of her service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of her Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

33

110.    Cox did not disclose to Ms. Lewis that the monthly price which she agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of her service plan; in fact Cox promised her the opposite, telling her that her quoted service rate at sign-up would not increase during the agreement.

111.    Each time Ms. Lewis signed up for a Promotional Agreement or Minimum Term Agreement, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Ms. Lewis did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term via increases to the Surcharges or via increases to the base price of the service plan itself. That information would have been material to her. If Ms. Lewis had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

112.    Ms. Lewis never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base price of the service plan itself, in the middle of her Minimum Term Agreement or Promotional Agreement.

113.    Ms. Lewis never agreed to pay increased Surcharges or an increased base price for the service plan during the term of the agreements.

114.    Ms. Lewis was not aware that she was a victim Cox's mid-agreement price increase scheme described above until July 2024, when she signed a retainer agreement with her attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Lewis.

115.    Ms. Lewis suffered damages during her Promotional Agreements and Minimum Term Agreements in the amount of the increases to her promised and quoted

fixed monthly service price.

116.    Ms. Lewis has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Lewis believes that she was given the services Cox promised her—just not at the quoted and fixed service price Cox promised and advertised to her, and which she agreed to pay.

**Plaintiff Bill Thacker**

117.    Plaintiff Bill Thacker was a citizen and resident of Tucson, Arizona, where he was a victim of Cox's deceptive pricing and billing scheme described herein. Mr. Thacker is currently a resident of Mountain View, Missouri.

118.    Mr. Thacker was a subscriber of Cox cable TV and internet services in Arizona for over 10 years until he cancelled his Cox services in the fall of 2021.

119.    Mr. Thacker typically signed up for and renewed his service plans over the telephone with Cox. In the process of researching his service plan options, Mr. Thacker also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told him over the phone.

120.    Mr. Thacker signed up for Minimum Term Agreements and Promotional Agreements with Cox. Each time that Mr. Thacker signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told him that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

121.    At least once during the term of each Minimum Term Agreement and Promotional Agreement that Mr. Thacker signed up for prior to March 23, 2021, Cox increased the price of his cable TV service by raising the amount of the Surcharges.

122.    Cox also harmed Mr. Thacker by increasing the base price of his service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of

his Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

123.    Cox did not disclose to Mr. Thacker that the monthly price which he agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of his service plan; in fact Cox promised him the opposite, telling him that his quoted service rate at sign-up would not increase during the agreement.

124.    Each time Mr. Thacker signed up for a Promotional Agreement or Minimum Term Agreement, he was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Mr. Thacker did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate term via increases to the Surcharges or to the base price of the service plan itself. That information would have been material to him. If Mr. Thacker had known that information, he would not have been willing to pay as much for his service plans and would have acted differently.

125.    Mr. Thacker never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base price of the service plan itself, in the middle of his Minimum Term Agreement or Promotional Agreement.

126.    Mr. Thacker never agreed to pay increased Surcharges or an increased base price for the service plan during the term of the agreements.

127.    Mr. Thacker was not aware that he was a victim Cox's mid-agreement price increase scheme described above until July 2024, when he signed a retainer agreement with his attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Mr. Thacker.

128.   Mr. Thacker suffered damages during his Promotional Agreements and Minimum Term Agreements in the amount of the increases to his promised and quoted fixed monthly service price.

129.   Mr. Thacker has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices.

**Plaintiff TP Lynn Jackson**

130.   Plaintiff TP Lynn Jackson is a citizen and resident of Goodyear, Arizona, where he was a victim of Cox's deceptive pricing and billing scheme described herein.

131.   Mr. Jackson first signed up for Cox services around 2019, and was a Cox cable TV and internet subscriber for over 2 years. Mr. Jackson cancelled his Cox services around January 2022.

132.   Mr. Jackson typically signed up for and renewed his service plans over the telephone with Cox. In the process of researching his service plan options, Mr. Jackson also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told him over the phone. Mr. Jackson also received and viewed direct mail advertising from Cox promoting its fixed price service plan agreements, which was likewise consistent with the promises and pricing that Cox agents told him over the phone.

133.   Mr. Jackson signed up for Minimum Term Agreements and/or Promotional Agreements with Cox. Each time that Mr. Jackson signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told him that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

134.   At least once during the term of each Minimum Term Agreement and Promotional Agreement that Mr. Jackson signed up for prior to March 23, 2021, Cox increased the price of his cable TV service by raising the amount of the Surcharges.

135.    Cox also harmed Mr. Jackson by increasing the base price of his service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of his Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

136.    Cox did not disclose to Mr. Jackson that the monthly price which he agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of his service plan; in fact Cox promised him the opposite, telling him that his quoted service rate at sign-up would not increase during the agreement.

137.    Each time Mr. Jackson signed up for a Promotional Agreement or Minimum Term Agreement, he was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Mr. Jackson did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate term via increases to the Surcharges or via increases to the base price of the service plan itself. That information would have been material to him. If Mr. Jackson had known that information, he would not have been willing to pay as much for his service plans and would have acted differently.

138.    Mr. Jackson never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base price of the service plan itself, in the middle of his Minimum Term Agreement or Promotional Agreement.

139.    Mr. Jackson never agreed to pay increased Surcharges or an increased base price for the service plan during the term of the agreements.

140.    Mr. Jackson was not aware that he was a victim Cox's mid-agreement price increase scheme described above until July 2024, when he signed a retainer agreement

1  with his attorneys. As a result of Cox's intentional misconduct, omissions, and

2  affirmative misrepresentations throughout the customer lifecycle as described herein,

3  Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed

4  from its subscribers, including Mr. Jackson.

5      141.   Mr. Jackson suffered damages during his Promotional Agreements and

6  Minimum Term Agreements in the amount of the increases to his promised and quoted

7  fixed monthly service price.

8      142.   Mr. Jackson has a legal right to rely now, and in the future, on the

9  truthfulness and accuracy of Cox's representations and advertisements regarding its

10  service plan prices. Mr. Jackson believes that he was given the services Cox promised

11  him—just not at the quoted and fixed service price Cox promised and advertised to him,

12  and which he agreed to pay.

13  **Plaintiff Carrie Rizzo**

14      143.   Plaintiff Carrie Rizzo is a citizen and resident of Queen Creek, Arizona,

15  and was a victim of Cox's deceptive pricing and billing scheme described herein while a

16  resident of Arizona.

17      144.   Ms. Rizzo was a subscriber of Cox cable TV and internet services for over

18  twenty-five years until she cancelled her Cox services at the end of January 2022.

19      145.   Ms. Rizzo typically signed up for and renewed her service plans over the

20  telephone with Cox. Ms. Rizzo also received and viewed direct mail advertising from

21  Cox promoting its fixed price service plan agreements, which was likewise consistent

22  with the promises and pricing that Cox agents told her over the phone. In the process of

23  researching her service plan options, Ms. Rizzo also visited the Cox website and viewed

24  Cox's advertising regarding its fixed price service plan agreements, which was consistent

25  with the promises and pricing that Cox agents told her over the phone.

26      146.   Ms. Rizzo signed up for Minimum Term Agreements and Promotional

27  Agreements with Cox. Each time that Ms. Rizzo signed up for a new Minimum Term

28  Agreement or Promotional Agreement, Cox affirmatively told her that the service price

would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

147.    At least once during the term of each Minimum Term Agreement and Promotional Agreement that Ms. Rizzo signed up for prior to March 23, 2021, Cox increased the price of her cable TV service by raising the amount of the Surcharges.

148.    Cox also harmed Ms. Rizzo by increasing the base price of her service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of her Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

149.    Cox did not disclose to Ms. Rizzo that the monthly price which she agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of her service plan; in fact Cox promised her the opposite, telling her that her quoted service rate at sign-up would not increase during the agreement.

150.    Each time Ms. Rizzo signed up for a Promotional Agreement or Minimum Term Agreement, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Ms. Rizzo did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term via increases to the Surcharges or via increases to the base price of the service plan itself. That information would have been material to her. If Ms. Rizzo had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

151.    Ms. Rizzo never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base price of the service plan itself, in the middle of her Minimum Term Agreement or Promotional Agreement.

152.    Ms. Rizzo never agreed to pay increased Surcharges or an increased base price for the service plan during the term of the agreements.

153.    Ms. Rizzo was not aware that she was a victim Cox's mid-agreement price increase scheme described above until July 2023, when she signed a retainer agreement with her attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Rizzo.

154.    Ms. Rizzo suffered damages during her Promotional Agreements and Minimum Term Agreements in the amount of the increases to her promised and quoted fixed monthly service price.

155.    Ms. Rizzo has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices.

**Plaintiffs Andrew Salazar and Antoinette Salazar**

156.    Plaintiffs Andrew Salazar and Antoinette Salazar are spouses, and are citizens and residents of Peoria, Arizona. The Salazars were victims of Cox's deceptive pricing and billing scheme described herein while residents of Arizona.

157.    The Salazars were subscribers of Cox cable TV, internet, and phone services for over fifteen years until they cancelled their Cox services around May 2023.

158.    The Salazars typically signed up for their service plans over the telephone with Cox. Although their Cox account is in Andrew Salazar's name, Antoinette Salazar is an authorized user for the account and was the one who usually managed the account and signed up for and renewed their services. In the process of researching their service plan options, Ms. Salazar also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told her over the phone.

159.    The Salazars signed up for Minimum Term Agreements and Promotional

Agreements with Cox. Each time that Ms. Salazar signed up over the phone for a new Minimum Term Agreement or Promotional Agreement on behalf of herself and her husband, Cox affirmatively told Ms. Salazar that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

160.    But contrary to Cox's promises, at least once during each Minimum Term Agreement and Promotional Agreement that the Salazars signed up for prior to March 23, 2021, Cox increased the price of their cable TV service by raising the amount of the Surcharges.

161.    For example, when the Salazars entered into a 2-year Minimum Term Agreement around February 2021 over the telephone, the Cox sales agent quoted and promised Ms. Salazar that the total monthly service price would be a fixed rate of $223.49 for the first 12 months of the agreement and $243.49 for the second 12 months. The agent promised and assured Ms. Salazar that the price would not increase above these rates during the term of the agreement.

162.    But contrary to Cox's promises, in December 2022 (during the second 12 months of the 2-year Minimum Term Agreement), Cox increased the monthly price of their service by $3.50 (from $243.49 to $246.99) by raising the Broadcast Surcharge and the Regional Sports Surcharge. Specifically, Cox increased the Broadcast Surcharge by $3.00 and the Regional Sports Surcharge by $0.50.

163.    Cox also harmed the Salazars by increasing the base price of their service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of their Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

164.    Cox did not disclose to the Salazars that the monthly price which they agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of their service plan; in fact Cox promised

them the opposite, telling them that their quoted service rate at sign-up would not increase during the agreement.

165.    Each time Ms. Salazar signed up for a Promotional Agreement or Minimum Term Agreement on behalf of herself and her husband, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. The Salazars did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of their fixed-rate term via increases to the Surcharges or to the base price of the service plan itself. That information would have been material to them. If the Salazars had known that information, they would not have been willing to pay as much for their service plans and would have acted differently.

166.    The Salazars never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base price of the service plan itself, in the middle of their Minimum Term Agreement or Promotional Agreement.

167.    The Salazars never agreed to pay increased Surcharges or an increased base price for the service plan during the term of the agreements.

168.    The Salazars were not aware that they were victims of Cox's mid-agreement price increase scheme described above until June 2023, when they signed retainer agreements with their attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including the Salazars.

169.    The Salazars suffered damages during their Promotional Agreements and Minimum Term Agreements in the amount of the increases to their promised and quoted fixed monthly service price.

170.    The Salazars have a legal right to rely now, and in the future, on the

truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. The Salazars believe that they were given the services Cox promised them—just not at the quoted and fixed service price Cox promised and advertised to them, and which they agreed to pay.

**Plaintiff Vicky Simmons**

171.    Plaintiff Vicky Simmons is a citizen and resident of Surprise, Arizona, where she was a victim of Cox's deceptive pricing and billing scheme described herein.

172.    Ms. Simmons was a subscriber of Cox cable TV and internet services for over fifteen years until she cancelled her Cox services in March 2021.

173.    Ms. Simmons typically signed up for and renewed her service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Simmons also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told her over the phone.

174.    Ms. Simmons signed up for Minimum Term Agreements with Cox. Each time that Ms. Simmons signed up for a new Minimum Term Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

175.    At least once during the term of each Minimum Term Agreement that Ms. Simmons signed up for, Cox increased the price of her cable TV service by raising the amount of the Surcharges.

176.    Cox did not disclose to Ms. Simmons that the monthly price which she agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges; in fact Cox promised her the opposite, telling her that her quoted service rate at sign-up would not increase during the agreement.

177.    Each time Ms. Simmons signed up for a Minimum Term Agreement, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the

agreement. Ms. Simmons did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term via increases to the Surcharges. That information would have been material to her. If Ms. Simmons had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

178.    Ms. Simmons never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her Minimum Term Agreement.

179.    Ms. Simmons never agreed to pay increased Surcharges for the service plan during the term of the agreements.

180.    Ms. Simmons was not aware that she was a victim Cox's mid-agreement price increase scheme described above until July 2024, when she signed a retainer agreement with her attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Simmons.

181.    Ms. Simmons suffered damages during her Minimum Term Agreements in the amount of the increases to her promised and quoted fixed monthly service price.

182.    Ms. Simmons has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Simmons believes that she was given the services Cox promised her—just not at the quoted and fixed service price Cox promised and advertised to her, and which she agreed to pay.

**Plaintiff Jack Ullstrup**

183.    Plaintiff Jack Ullstrup is a citizen and resident of Phoenix, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a resident of Arizona.

184.    Mr. Ullstrup was a subscriber of Cox cable TV and internet services for over 15 years until he cancelled his Cox services around November 2020.

185.    Mr. Ullstrup typically signed up for and renewed his service plans over the telephone with Cox. In the process of researching his service plan options, Mr. Ullstrup also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told him over the phone.

186.    Mr. Ullstrup signed up for Minimum Term Agreements with Cox. Each time that Mr. Ullstrup signed up for a new Minimum Term Agreement, Cox affirmatively told him that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

187.    At least once during the term of each Minimum Term Agreement that Mr. Ullstrup signed up for, Cox increased the price of his cable TV service by raising the amount of the Surcharges.

188.    For example, in November 2017 Mr. Ullstrup signed up on the phone with a Cox agent for a 2-year Minimum Term Agreement for an internet and television service plan after the agent promised him that the monthly service price would be at a quoted fixed rate. The agent promised and assured Mr. Ullstrup that the price would not increase above the quoted fixed rate during the term of the agreement.

189.    However, contrary to Cox's promises and representations to him, Cox increased Mr. Ullstrup's supposedly fixed rate in January 2018 and again in January 2019—each time by raising the amount of the Surcharges.

190.    Cox did not disclose to Mr. Ullstrup that the monthly price which he agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges; in fact Cox promised him the opposite, telling him that his quoted service rate at sign-up would not increase during the agreement.

191.    Each time Mr. Ullstrup signed up for a Minimum Term Agreement, he was relying on Cox's explicit representations that the monthly service rate would be the

quoted and advertised dollar amount and would not increase during the term of the agreement. Mr. Ullstrup did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate term via increases to the Surcharges. That information would have been material to him. If Mr. Ullstrup had known that information, he would not have been willing to pay as much for his service plans and would have acted differently.

192.    Mr. Ullstrup never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his Minimum Term Agreement.

193.    Mr. Ullstrup never agreed to pay increased Surcharges during the term of the agreements.

194.    Mr. Ullstrup was not aware that he was a victim Cox's mid-agreement price increase scheme described above until July 2024, when he signed a retainer agreement with his attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Mr. Ullstrup.

195.    Mr. Ullstrup suffered damages during his Minimum Term Agreements in the amount of the increases to his promised and quoted fixed monthly service price.

196.    Mr. Ullstrup has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Mr. Ullstrup believes that he was given the services Cox promised him—just not at the quoted and fixed service price Cox promised and advertised to him, and which he agreed to pay.

**Plaintiff Vern Urich**

197.    Plaintiff Vern Urich is a citizen and resident Sun City West, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a

resident of Arizona.

198.    Mr. Urich's Cox account is in his mother's name, Joan Urich Moses, who has been a Cox subscriber of Cox cable TV, internet, and phone services for approximately 30 years. Mr. Urich is the caretaker and has power of attorney for Ms. Moses, and Mr. Urich is an authorized user on the account. For the last 10 years, Mr. Urich has been the one who manages the Cox account and who signs up for Cox service plans.

199.    Mr. Urich typically signed up for Cox service plans over the telephone with Cox. In the process of researching their service plan options, Mr. Urich also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told him over the phone.

200.    Mr. Urich signed up for Minimum Term Agreements and Promotional Agreements with Cox. Each time that Mr. Urich signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told him that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

201.    But contrary to Cox's promises, at least once during the term of each Minimum Term Agreement and Promotional Agreement that Mr. Urich signed up for prior to March 23, 2021, Cox increased the price of their cable TV service by raising the amount of the Surcharges.

202.    Cox also harmed Mr. Urich and his mother by increasing the base price of their service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of their Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

203.    For example, in November 2022 Mr. Urich signed up on the phone with a Cox agent for a 1-year Promotional Agreement for a service plan, after a Cox agent

48

quoted and promised him that the total monthly service price would be a fixed rate of $219.49 (including $98.00 for the "Contour TV Preferred" portion and $62.99 for the "Cox Internet Preferred" portion). The agent promised and assured Mr. Urich that the price would not increase during the term of the agreement.

204.    However, contrary to Cox's promises and representations to him, Cox raised the supposedly fixed rate in the middle of the agreement, in January 2023. Starting in January 2023, Cox increased the monthly price of their service by $9.00 (to $228.49) by raising the base price of both the TV and internet portions of his service plan. Specifically, Cox increased the "Contour TV Preferred" portion of their service plan by $7.00 (from $98.00 to $105.00), and Cox increased the "Cox Internet Preferred" portion of their service plan by $2.00 (from $62.99 to $64.99). Their service prices were increased as part of Cox's annual company-wide price increases of nearly all of Cox's TV and internet plans, despite Cox's promise and representations to Mr. Urich that the price would not increase during the Promotional Agreement term.

205.    Cox did not disclose to Mr. Urich that the monthly price which he agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of their service plan; in fact Cox promised Mr. Urich the opposite, telling him that the quoted service rate at sign-up would not increase during the agreement.

206.    Each time Mr. Urich signed up for a Promotional Agreement or Minimum Term Agreement, he was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Mr. Urich did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of the promised fixed-rate term via increases to the Surcharges or to the base price of the service plan itself. That information would have been material to him. If Mr. Urich had known that information, he would not have been willing to pay as much for his service plans and would have acted differently.

207.    Mr. Urich never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base price of the service plan itself, in the middle of their Minimum Term Agreement or Promotional Agreement.

208.    Mr. Urich has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Urich receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the base price of the service plan itself.

209.    Mr. Urich never agreed to pay increased Surcharges or an increased base price for the service plan during the term of the agreements.

210.    Mr. Urich was not aware that he and his mother were victims of Cox's mid-agreement price increase scheme described above until June 2023, when Mr. Urich signed a retainer agreement with his attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Mr. Urich.

211.    Mr. Urich and his mother suffered damages during their Promotional Agreements and Minimum Term Agreements in the amount of the increases to the promised and quoted fixed monthly service price.

212.    Mr. Urich, on behalf of his mother, remains a Cox subscriber of internet and cable TV services as of this filing. Mr. Urich has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Mr. Urich believe that he and his mother were given the

50

services Cox promised him—just not at the quoted and fixed service price Cox promised and advertised to him, and which he agreed to pay.

**Plaintiff Linda Verner**

213. Plaintiff Linda Verner is a citizen and resident of Phoenix, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a resident of Arizona.

214. Ms. Verner typically signed up for Cox service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Verner also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told her over the phone.

215. Ms. Verner signed up for Minimum Term Agreements and Promotional Agreements with Cox. Each time that Ms. Verner signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

216. But contrary to Cox's promises, at least once during the term of each Minimum Term Agreement and Promotional Agreement that Ms. Verner signed up for prior to March 23, 2021, Cox increased the price of her cable TV service by raising the amount of the Surcharges.

217. Cox also harmed Ms. Verner by increasing the base price of her service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of her Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

218. For example, when Ms. Verner entered into a 2-year Promotional Agreement in September 2021 over the telephone, the Cox sales agent quoted and promised Ms. Verner a fixed price on her Cox services for the duration of the agreement,

including $98.00 for the "Contour TV Preferred" portion plus $57.99 for the "Cox Internet Preferred" portion. The agent promised and assured Ms. Verner that the price would not increase during the term of the agreement.

219.    But contrary to Cox's promises, in January 2023 in the middle of Ms. Verner's fixed price Promotional Agreement, Cox increased the monthly price of her service plan by $9.00 by raising the base price of both the TV and internet portions of the service plan. Specifically, Cox increased the "Contour TV Preferred" portion of her service plan by $7.00 (from $98.00 to $105.00), and Cox increased the "Cox Internet Preferred" portion of her service plan by $2.00 (from $57.99 to $59.99). Her service prices were increased as part of Cox's annual company-wide price increases of nearly all of Cox's TV and internet plans, despite Cox's promise and representations to Ms. Verner that the price would not increase during the Promotional Agreement term.

220.    Cox did not disclose to Ms. Verner that the monthly price which she agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of her service plan; in fact Cox promised Ms. Verner the opposite, telling her that the quoted service rate at sign-up would not increase during the agreement.

221.    Each time Ms. Verner signed up for a Promotional Agreement or Minimum Term Agreement, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Ms. Verner did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of the promised fixed-rate term via increases to the Surcharges or to the base price of the service plan itself. That information would have been material to her. If Ms. Verner had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

222.    Ms. Verner never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base

price of the service plan itself, in the middle of her Minimum Term Agreement or Promotional Agreement.

223.    Ms. Verner has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged her to do. Through this billing process, Ms. Verner receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the base rate of the service plan itself.

224.    Ms. Verner never agreed to pay increased Surcharges or an increased base price for the service plan during the term of the agreements.

225.    Ms. Verner was not aware that she was a victim of Cox's mid-agreement price increase scheme described above until July 2023, when Ms. Verner signed a retainer agreement with her attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Verner.

226.    Ms. Verner suffered damages during her Promotional Agreements and Minimum Term Agreements in the amount of the increases to the promised and quoted fixed monthly service price.

227.    Ms. Verner remains a subscriber to Cox internet and cable TV services as of this filing. Ms. Verner has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Verner believe that she was given the services Cox promised her—just not at the quoted and fixed service price Cox promised and advertised to her, and which she agreed to pay.

**Plaintiff Rosemarie Vlacich**

228.    Plaintiff Rosemarie Vlacich is a citizen and resident of Chandler, Arizona, and was a victim of Cox's deceptive pricing and billing scheme described herein while a resident of Arizona.

229.    Ms. Vlacich was a subscriber of Cox cable TV and internet services for approximately five years until she cancelled her Cox services in February 2022.

230.    Ms. Vlacich typically signed up for and renewed her service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Simmons also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told her over the phone.

231.    Ms. Vlacich signed up for Minimum Term Agreements and Promotional Agreements with Cox. Each time that Ms. Vlacich signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

232.    At least once during the term of each Minimum Term Agreement and Promotional Agreement that Ms. Vlacich signed up for prior to March 23, 2021, Cox increased the price of her cable TV service by raising the amount of the Surcharges.

233.    Cox also harmed Ms. Vlacich by increasing the base price of her service plans in the middle of promised fixed price Promotional Agreements. Contrary to Cox's promises and sign-up representations of quoted fixed-rate prices, Cox raised the price of her Promotional Agreement service plans in the first quarter of each year when Cox implemented its annual company-wide service plan price increases.

234.    Cox did not disclose to Ms. Vlacich that the monthly price which she agreed to pay could, and would, increase during the agreement period as a result of increases to the Surcharges or to the base price of her service plan; in fact Cox promised her the opposite, telling her that her quoted service rate at sign-up would not increase

1    during the agreement.

2    235.    Each time Ms. Vlacich signed up for a Promotional Agreement or

3    Minimum Term Agreement, she was relying on Cox's explicit representations that the

4    monthly service rate would be the quoted and advertised dollar amount and would not

5    increase during the term of the agreement. Ms. Vlacich did not know or expect that

6    contrary to Cox's promises and representations, Cox would in fact covertly increase the

7    monthly service rate in the middle of her supposedly fixed-rate term via increases to the

8    Surcharges or via increases to the base price of the service plan itself. That information

9    would have been material to her. If Ms. Vlacich had known that information, she would

10    not have been willing to pay as much for her service plans and would have acted

11    differently.

12    236.    Ms. Vlacich never noticed that Cox had increased the amounts of the

13    Broadcast Surcharge and Regional Sports Surcharge, or that Cox had increased the base

14    price of the service plan itself, in the middle of her Minimum Term Agreement or

15    Promotional Agreement.

16    237.    Ms. Vlacich was signed up for electronic billing and Cox's automatic

17    payment program, EasyPay, as Cox encouraged her to do. Through this billing process,

18    Ms. Vlacich received a monthly Cox billing email which stated her bill total and

19    informed her that her bill would be automatically paid by the payment due date because

20    she was signed up for EasyPay. Cox's EasyPay program discourages customers from

21    reviewing their monthly bill. And, because Cox's billing emails only state the bill total,

22    customers cannot tell from the email itself that Cox has increased their monthly service

23    rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge or by

24    increasing the base price of the service plan itself.

25    238.    Ms. Vlacich never agreed to pay increased Surcharges or an increased base

26    price for the service plan during the term of the agreements.

27    239.    Ms. Vlacich was not aware that she was a victim Cox's mid-agreement

28    price increase scheme described above until July 2024, when she signed a retainer

agreement with her attorneys. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Vlacich.

240. Ms. Vlacich suffered damages during her Promotional Agreements and Minimum Term Agreements in the amount of the increases to her promised and quoted fixed monthly service price.

241. Ms. Vlacich has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Vlacich believes that she was given the services Cox promised her—just not at the quoted and fixed service price Cox promised and advertised to her, and which she agreed to pay.

1

**VI.    CLASS ALLEGATIONS**

2          242.    Plaintiffs bring this lawsuit as a class action, on behalf of themselves and

3  all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2),

4  and (b)(3).

5          243.    **Class Definition.**  Plaintiffs seek certification of the following class:

6                  **All current and former Cox subscribers in Arizona who**
                   **signed  up  for  a  Minimum  Term  Agreement[17]  or**
7                  **Promotional  Agreement[18]  and  whose  service  price  was**
                   **increased in the middle of the agreement period above the**
8                  **initially quoted rates.**

9          244.    **Surcharges Subclass Definition.**  Plaintiffs also seek certification of the

10  following Subclass:

11                 **All current and former Cox subscribers in Arizona who**
                   **signed up for a Minimum Term Agreement or Promotional**
12                 **Agreement and whose service price was increased in the**
                   **middle  of  the  agreement  period  via  increases  to  the**
13                 **Broadcast    Surcharge    and/or    the    Regional    Sports**
                   **Surcharge.**
14

15         245.    **Base Price Increase Subclass Definition.**  Plaintiffs also seek certification

16  of the following Subclass:

17                 **All current and former Cox subscribers in Arizona who**
                   **signed up for a Promotional Agreement and whose service**
18                 **price was increased in the middle of the agreement period**
                   **above  the  initially  quoted  rates  via  increases  to  the  base**
19                 **price of the service plan itself.**

20         246.    This Court should apply the **discovery rule** to extend any applicable

21  [17] "Minimum Term Agreement" as used in this Complaint means a service plan
22  agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-
    price promotional rate for a stated period of time, typically for 1 or 2 years, and the
23  subscriber is subject to an early termination fee penalty if he or she terminates service
    prior to the end of the promotional period. "Minimum Term Agreement" does not refer to
24  a specific written contract document. Cox offered Minimum Term Agreements both to
    new customers and to existing customers who were renewing or changing their service
25  plans

26  [18] "Promotional Agreement" as used in this Complaint means a service plan agreement
27  that is advertised by Cox where the subscriber is promised a quoted, fixed-price
    promotional rate for a stated period of time, typically for 1 or 2 years, with no early
28  termination fee penalty. Cox offered Promotional Agreements both to new customers and
    to existing customers who were renewing or changing their service plans.

limitations period (and the corresponding Class periods) for the Plaintiffs and each Class and Subclass member to January 1, 2015—which is the date, based on counsel's investigation, that Cox first engaged in its deceptive and unlawful practice of increasing its service prices in the middle of advertised and promised fixed-rate agreements. The nature of Cox's misconduct was non-obvious and intentionally concealed from its subscribers. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Class and Subclasses could have, through the use of reasonable diligence, learned of the accrual of their claims against Cox at an earlier time.

247. Specifically excluded from the Class and Subclasses are Cox and any entities in which Cox has a controlling interest, Cox's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

248. **Numerosity.**  The number of members of each Class and Subclass (collectively, the "Class members") are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of class members prior to discovery. However, based on information and belief, each Class and Subclass comprises hundreds of thousands of individuals. The exact number and identities of Class members are contained in Cox's records and can be easily ascertained from those records.

249. **Commonality and Predominance.**  All claims in this action arise exclusively from the uniform policies and procedures of Defendants as outlined herein. This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a. Whether Cox advertised and promised that the monthly price of its service plans would be fixed and would not increase above the initially-quoted rates during 1- or 2-year Minimum Term Agreements;

b.      Whether Cox advertised and promised that the monthly price of its service plans would be fixed and would not increase above the initially-quoted rates during 1- or 2-year Promotional Agreements;

c.      Whether Cox increased its monthly service prices in the middle of Minimum Term Agreements and Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

d.      Whether Cox increased its monthly service prices in the middle of Promotional Agreements above the initially-quoted rates by raising the base price of the service plan itself;

e.      What is the nature or purpose of the Broadcast Surcharge, and whether the Broadcast Surcharge is a monthly service fee for providing cable TV service;

f.      What is the nature or purpose of the Regional Sports Surcharge, and whether the Regional Sports Surcharge is a monthly service fee for providing cable TV service;

g.      Whether increases to the Broadcast Surcharge and the Regional Sports Surcharge are increases to the price of the monthly service;

h.      Whether Cox's policy and practice of increasing the monthly service price in the middle of Minimum Term Agreements or Promotional Agreements by raising the Broadcast Surcharge and Regional Sports Surcharge is material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

i.      Whether Cox's policy and practice of increasing the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself is material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

j.      Whether it was a breach of contract for Cox to unilaterally increase the monthly service price in the middle of Minimum Term Agreements or Promotional Agreements by increasing the Broadcast Surcharge and/or Regional Sports Surcharge;

k.    Whether it was a breach of contract for Cox to unilaterally increase the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

l.    Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Minimum Term Agreements or Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

m.    Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

n.    Whether Cox was unjustly enriched by its misconduct alleged herein;

o.    Whether Cox's misconduct alleged herein constituted deceptive trade practices in violation of the Arizona Consumer Fraud Act;

p.    Whether Plaintiffs and the classes are entitled to refunds and/or damages as a result of Cox's misconduct alleged herein; and

q.    Whether Plaintiffs and the classes are entitled to an order enjoining Cox from continued engagement in the misconduct alleged herein.

250.    **Typicality.**  Plaintiffs' claims are typical of Class members' claims. Plaintiffs and Class members all sustained injury as a direct result of Cox's uniform practices and schemes alleged herein, bring the same claims, and face the same potential defenses.

251.    Adequacy.  Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Class and Subclasses. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

252.    **Superiority.**  A class action is superior to all other available methods for

fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Cox's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

253.    By its misconduct and omissions alleged herein, Cox has acted and refused to act on grounds that apply generally to the Class and Subclasses, such that final declaratory relief and injunctive relief is appropriate respecting each Class and Subclass as a whole.

254.    Without the proposed class action, Cox will likely retain the benefits of its wrongdoing and will continue the complained-of practices, which will result in further damages to Plaintiffs and class members.

255.    Cox is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox that consist of representations of fact about Cox's business operations or services that are or were made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in Cox's services, or the statements are or were made in the course of delivering Cox's services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox for which the intended audience is an actual or potential customer or subscriber, or a person likely to repeat the statements to, or otherwise influence, an actual or potential customer or subscriber.

# COUNT I

## Violation of Arizona Consumer Fraud Act,
## Ariz. Rev. Stat. §§ 44-1521, *et seq.*

256.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

257.    Plaintiffs bring this cause of action in their individual capacities and as representatives of the Class and Subclasses.

258.    Cox's material affirmative misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive trade practices in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, et seq.

259.    Ariz. Rev. Stat. § 44-1522(A) provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

260.    The Arizona Supreme Court has held that the Act creates an implied private right of action for damages, including punitive damages. *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 521 P.2d 1119, 1122 (1974).

261.    By the acts and omissions alleged herein, Cox has violated and continues to violate Ariz. Rev. Stat. § 44-1522(A) and the Arizona Consumer Fraud Act, causing damage to Plaintiffs and the Class members.

262.    As a result of Cox's violations, each Plaintiff and Class and Subclass member has suffered damages and is therefore entitled to recover actual, statutory, and/or punitive damages. Pursuant to the statute, Plaintiffs and the Class and Subclass members are also entitled to an injunction to halt Cox's unlawful practices described herein.

# COUNT II

## Breach of Contract

263.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if

fully set forth herein.

264.    Plaintiffs bring this cause of action in their individual capacities and as representatives of the Class and Subclasses.

265.    By the uniform conduct alleged herein, Cox has breached its contracts with Plaintiffs and the Class members, and Plaintiffs and the Class members have sustained damages as a result of said breaches.

266.    Specifically, Cox entered into contracts with new and existing customers in which Cox promised that the monthly prices for Cox's service plans would be at a specific quoted and fixed rate for a 1- or 2-year Minimum Term Agreement or Promotional Agreement, but then, after the customer signed up, Cox as a matter of policy would breach that contract by increasing the service price in the middle of the promised fixed-rate period. Thus, Cox unilaterally charged its customers more money than they had agreed and contracted to pay for Cox service plans during the specified time periods.

267.    **Surcharges Subclasses.**  Plaintiffs also bring this cause of action as representatives of the Surcharges Subclass.

268.    Cox entered into contracts with Plaintiffs and members of the Surcharges Subclass when Plaintiffs and the Subclass members each accepted Cox's offer of a specified service plan at a specified monthly rate under a 1- or 2-year Minimum Term Agreement or Promotional Agreement.

269.    All of the contracts between Cox and Plaintiffs and Surcharges Subclass members contained the following material terms: Cox would provide the ordered service plan, and, in exchange, the customers would pay a specific promised price for service per month that was fixed and would not increase above the quoted rates for 1 or 2 years.

270.    Plaintiffs and the Subclass members have performed, for the relevant time frame, all of each's material obligations under the contract or have been excused from any non-performance.

271.    Cox breached the contract by raising the monthly service price in the middle of its fixed-rate Minimum Term Agreements or Promotional Agreements with

Plaintiffs and Surcharges Subclass members, via increases to the Broadcast Surcharge and/or the Regional Sports Surcharge.

272. Plaintiffs and Surcharges Subclass members sustained damages as a result of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the members of the Subclass paid in mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge.

273. **Base Price Increase Subclass.** Plaintiffs also bring this cause of action as representatives of the Base Price Increase Subclass.

274. Cox entered into contracts with Plaintiffs and members of the Base Price Increase Subclass when Plaintiffs and the Subclass members each accepted Cox's offer of a specified service plan at a specified monthly rate under a 1- or 2-year Promotional Agreement.

275. All of the contracts between Cox and Plaintiffs and the members of the Base Price Increase Subclass contained the following material terms: Cox would provide the ordered service plan, and, in exchange, the customer would pay a specific promised monthly price for service that was fixed and would not increase above the quoted rates for 1 or 2 years.

276. Plaintiffs and the members of the Subclass have performed, for the relevant time frame, all of each's material obligations under the contract or have been excused from any non-performance.

277. Cox breached the contract by increasing the base price of the service plan above the quoted rates in the middle of fixed-rate Promotional Agreements with Plaintiffs and the members of the Subclass.

278. Plaintiffs and Base Price Increase Subclass members sustained damages as a result of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the members of the Subclass paid in mid-promotion service price increases above the initially quoted and agreed-to rates.

## COUNT III

### Breach of Implied Covenant of Good Faith and Fair Dealing

279.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

280.    Plaintiffs bring this cause of action in their individual capacities and as representatives of the Class and Subclasses.

281.    Plaintiffs allege this cause of action in the alternative to Count II.

282.    To the extent any applicable contract could be read as granting Cox discretion to increase the Broadcast Surcharge and/or Regional Sports Surcharge or to increase the base price of a customer's service plan in the middle of a promised fixed-rate Minimum Term Agreement or Promotional Agreement—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by Arizona law.

283.    Cox has violated the covenant of good faith and fair dealing by its conduct alleged herein.

284.    Specifically, Cox has abused any discretion it purportedly had under any applicable contract to raise the monthly price of its service plans above the initially quoted and agreed-to rates in the middle of promised fixed-rate Minimum Term Agreements or Promotional Agreements. For example:

a.    Cox misrepresented in its advertising and in its communications with consumers that the prices of its service plans were fixed and would not increase above the initially quoted rates during 1- or 2-year Minimum Term Agreements or Promotional Agreements;

b.    Through the conduct alleged herein, Cox unilaterally increased the prices of its service plans in the middle of promised fixed-rate periods over and above the promised and advertised rates which its customers agreed to pay, and surreptitiously hid and failed to disclose these price increases;

c.      With regard to customers in Minimum Term Agreements, Cox imposed early termination fee penalties in order to prevent or discourage customers from freely canceling their services if they learned that Cox had increased the price of their services above the initially quoted rates in the middle of promised fixed-rate agreements;

d.      With regard to mid-agreement Surcharges increases, if any customers discovered that their service plans had increased in price and called Cox to complain, Cox agents would justify the increase by arguing that only the Surcharges had increased while the service price had remained the same (even though the Surcharges were in fact charges for service), and the agents would also falsely say that the Surcharges were pass-through government fees and/or were outside of Cox's control; and

e.      With regard to the increase of the service plan base price during a Promotional Agreement, if any customers discovered the price increases and called Cox to complain, Cox agents would justify the increases by arguing that the customer's promotional discount dollar amount (from Cox's ever-increasing "retail rate") had remained the same, even though Cox's explicit pre-sale representations and advertisements promised that the monthly price would remain the same.

285.   Cox's mid-agreement increases to the service price above the initially-quoted rates were contrary to Cox's representations and promises, defied customers' reasonable expectations, were objectively unreasonable, and frustrated the basic terms of the parties' agreement. Cox's conduct alleged herein was arbitrary and in bad faith.

286.   Cox's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the members of the Class and Subclasses the full benefit of their bargains with Cox.

287.   Plaintiffs and the members of the Class and Subclasses have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Cox. There is no legitimate excuse or defense for Cox's conduct.

288.   Any attempts by Cox to defend its mid-agreement service price increases above the initially quoted rates through reliance on supposed contractual provisions will

be without merit. Plaintiffs and the members of the Class and Subclasses never knowingly agreed to any such provisions, are not subject to them, or the provisions are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are unenforceable in light of the hidden and deceptive nature of Cox's misconduct, among other reasons. Any such provisions, even if they existed, would not excuse Cox's abuses of discretion or otherwise preclude Plaintiffs and the members of the Class and Subclasses from recovering for breach of the covenant of good faith and fair dealing.

289.    Plaintiffs and the members of the Class and Subclasses sustained damages as a result of Cox's breaches of the covenant of good faith and fair dealing. Plaintiffs seek damages in the amount they and the members of the Class and Subclasses paid in service price increases above the initially quoted rates, which were imposed by Cox in the middle of their Minimum Term Agreements and Promotional Agreements.

## COUNT IV

### Unjust Enrichment

290.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

291.    Plaintiffs bring this cause of action in their individual capacities and as representatives of the Class and Subclasses.

292.    Plaintiffs bring this cause of action in the alternative to Counts I and II.

293.    By the acts alleged herein, Plaintiffs and the Class members have conferred substantial benefits on Cox and Cox has knowingly and willingly accepted and enjoyed these benefits.

294.    Cox either knew or should have known that the payments rendered by Plaintiffs and the Class members were given and received with the expectation that the services would be provided by Cox at the price represented and warranted. Despite this, Cox demanded and accepted amounts from Plaintiffs and Class members which were

1   higher than what Cox previously quoted and promised.

2       295.   And as described above at ¶¶ 97–103, Cox concealed its price increases

3   from its subscribers and continued to deceive them after they signed up.

4       296.   For Cox to retain the benefit of the excess payments under these

5   circumstances is inequitable.

6       297.   Cox, through deliberate misrepresentations or omissions in connection with

7   the advertising, marketing, promotion, and sale of its service plans, reaped benefits,

8   which resulted in Cox's wrongful receipt of profits.

9       298.   Equity demands disgorgement of Cox's ill-gotten gains. Cox will be

10  unjustly enriched unless Cox is ordered to disgorge those profits for the benefit of

11  Plaintiffs and the Class members.

12      299.   As a direct and proximate result of Cox's wrongful conduct and unjust

13  enrichment, Plaintiffs and the Class members are entitled to the institution of and

14  restitution from a constructive trust disgorging all profits, benefits, and other

15  compensation obtained by Cox through this inequitable conduct.

16                          **PRAYER FOR RELIEF**

17      WHEREFORE, Plaintiffs Raven Lewis, Bill Thacker, TP Lynn Jackson, Carrie

18  Rizzo, Andrew Salazar, Antoinette Salazar, Vicky Simmons, Jack Ullstrup, Vern Urich,

19  Linda Verner, and Rosemarie Vlacich, on behalf of themselves and proposed Class and

20  Subclasses, ask this Court to:

21      A.     Declare that Cox's conduct alleged herein violates the laws cited above;

22      B.     Certify the case as a class action and appoint Plaintiffs and their counsel to

23  represent the Class and Subclasses;

24      C.     Order that the discovery rule applies to extend any applicable limitations

25  periods (and the corresponding class periods) for the Class and Subclasses to the date on

26  which Cox first began the alleged unlawful practices, which based on the investigation of

27  Plaintiffs' counsel is January 1, 2015;

28      D.     Declare that Cox is financially responsible for notifying all Class and

Subclass members of Cox's deceptive and unconscionable business practices alleged herein;

E.    Permanently enjoin Cox from engaging in the misconduct alleged herein;

F.    Retain jurisdiction to monitor Cox's compliance with the permanent injunctive relief;

G.    Order disgorgement and/or restitution, including, without limitation, disgorgement of all revenues, profits and/or unjust enrichment that Cox obtained, directly or indirectly, from Plaintiffs and Class and Subclass members as a result of the unlawful conduct alleged herein;

H.    Order Cox to hold in constructive trust all payments received from Plaintiffs and the Class and Subclass members with respect to the unlawful practices alleged herein;

I.    Order Cox to perform an accounting of all such payments;

J.    Enter judgment in favor of Plaintiffs and the Class and Subclass members for damages suffered as a result of the conduct alleged herein;

K.    Order Cox to pay punitive, exemplary, treble, and/or statutory damages to the Plaintiffs and Class and Subclass members under the laws outlined herein;

L.    Order Cox to identify and give notice to each and every past and current subscriber in Arizona who signed up for a Minimum Term Agreement or Promotional Agreement and whose service price was increased in the middle of the agreement period above the initially quoted rates, of the following: (1) give notice that the subscriber was the victim of unlawful mid-agreement price increases by Cox; and (2) give notice of the specific dollar amount the subscriber was overcharged by Cox via the price increases;

M.    Order Cox to pay attorneys' fees and costs to the extent allowed by law;

N.    Order Cox to pay pre-judgment and post-judgment interest to the extent allowed by law; and

O.    Grant such other and further legal and equitable relief as the Court deems just and proper.

1

## JURY TRIAL DEMAND

2

PLEASE TAKE NOTICE that the Plaintiffs hereby demand a trial by jury on all

3

issues so triable.

4

Date: September 4, 2024

5

Presented by:

6

KENT LAW OFFICES

7

By:  _/s/ Trinette G. Kent_

8

Trinette G. Kent (AZ Bar No. 025180)
3219 E. Camelback Rd #588

9

Phoenix, AZ 85018-2346
Telephone: (480) 247-9644

10

Email: tkent@kentlawpc.com

11

Daniel M. Hattis*
Paul Karl Lukacs*

12

HATTIS & LUKACS
11711 SE 8th St, Ste 120

13

Bellevue, WA 98005
Telephone: (425) 233-8650

14

Email: dan@hattislaw.com
Email: pkl@hattislaw.com

15

16

Stephen P. DeNittis, Esq.*
Shane T. Prince, Esq.*

17

DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410

18

525 Route 73 N.
Marlton, New Jersey 08057

19

Telephone: (856) 797-9951
Email: sdenittis@denittislaw.com

20

Email: sprince@denittislaw.com

21

* Pro Hac Vice Application To Be Submitted

22

*Attorneys for Plaintiffs and the Proposed Class and Subclasses*

23

24

25

26

27

28

70